Carl M. LIMBAUGH, Plaintiff-Appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a corporation, et al., Defendants-Appellees.

No. 82–7347.

United States Court of Appeals, Eleventh Circuit.

May 21, 1984.

Leo E. Costello, Birmingham, Ala., for plaintiff-appellant.

N. Lee Cooper, A. Inge Selden, III, Birmingham, Ala., for defendants-appellees.

Before GODBOLD, Chief Judge, RONEY and SMITH *, Circuit Judges.

RONEY, Circuit Judge:

When Carl M. Limbaugh failed to deliver 182 shares of stock to cover a sale made for him by stockbrokers Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), Merrill Lynch liquidated a portion of his Ready Assets Trust account to buy shares for delivery to the purchaser. Limbaugh then sued Merrill Lynch for conversion, seeking actual and punitive damages. The district court granted summary judgment for Merrill Lynch on the ground that there was no conversion under Alabama law. Although we agree that Limbaugh owed the 182 shares of stock to Merrill Lynch, we hold that absent contractual or other authorization, Merrill Lynch could not simply liquidate the Ready Assets account to cover this debt.

There is an initial dispute over whether Limbaugh owed the shares at all. They were the result of a stock split that occurred near the time of sale and the delivery of shares sold by Limbaugh, so that the dates of the activity leading up to the dispute are important. On or about October 26, 1981, Limbaugh called Merrill Lynch and told broker John B. Thompson that he had read an article in the Birmingham News which stated that Golden Enterprises, Inc. stock had undergone a split. Limbaugh told Thompson that he wished to sell 365 shares of his stock for $18.00 or more per share.

On October 29, 1981, Thompson sold the 365 shares of Golden Enterprises, Inc., advised Limbaugh, and asked him to bring in his certificate for the 365 shares. About November 3, 1981, Limbaugh carried the certificate to Thompson at Merrill Lynch.

---

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

On this same occasion, Limbaugh also carried with him a stock certificate for 182 additional shares of Golden Enterprises, Inc. which were generated by the stock split. Limbaugh presented both stock certificates. Thompson kept only the certificate for 365 shares, and remarked to Limbaugh, "you made out like a champ." Limbaugh received $6,510.86 from the sale of stock and invested $6,510.00 in a "Ready Assets Trust" which Thompson opened for him.

Approximately two weeks later, Thompson called Limbaugh and told him that the stock had been sold prior to the ex-dividend date and therefore the 182 shares which resulted from the split must go to the purchaser. After several conversations during which Merrill Lynch threatened to liquidate Limbaugh's Ready Assets account, Limbaugh refused to deliver the shares, and on November 25, 1981, Merrill Lynch liquidated $2,725.00 of the account to purchase the shares needed and pay itself a commission for that purchase. This suit was filed on December 8, 1981.

■ There can be little question that Limbaugh should have delivered and Merrill Lynch should have accepted the 182 shares at the time Limbaugh delivered the 365 shares that he had sold. The *record date* of the Golden Enterprises stock split was October 8, 1981. The record date is the date on which one must be registered as a shareholder on the stock book of a company in order to *receive* a dividend declared by that company. The fact that an individual is the holder of record on the record date, however, does not necessarily mean that such person is entitled to retain the dividend. In terms of entitlement, the *ex-dividend* date is the dividing line. In the instant case, the ex-dividend date of the Golden Enterprises stock split was November 2, 1981. When stock is sold prior to the ex-dividend date, the right to a dividend goes with the stock to the purchaser, rather than staying with the seller. Because Limbaugh sold his Golden Enterprises stock on October 29, 1981, prior to the ex-dividend date, he was not entitled to

ownership of the additional 182 shares generated by the split. Because he sold his stock after the record date, however, the additional 182 shares were mailed to him by Golden Enterprises. The record date and the ex-dividend date are scheduled by the company whose stock is involved, not by the stock broker. Generally the ex-dividend date precedes the record date, and the stockholder entitled to the dividend is the individual to whom the dividend is sent. In the instant case, however, Golden Enterprises scheduled the record date to precede the ex-dividend date, and as a result Limbaugh received 182 shares of stock.

In a carefully reasoned opinion, the district court properly concluded there was no issue of fact, and that Limbaugh was indeed indebted to Merrill Lynch for the value of the 182 shares of Golden Enterprises, Inc.

■ Limbaugh's argument that the acceptance by the broker of the 365-share certificate and the return of the 182 shares constituted an accord and satisfaction of his debt to Merrill Lynch is without merit. An accord and satisfaction requires that there be a disputed debt. The Alabama Supreme Court has noted that:

[f]or payment of a lesser amount to operate as a satisfaction of a debt ... there must be a bona fide dispute as to the amount due, or an independent consideration, or written agreement, or a surrender of the evidence of the debt.... There can be no waiver without the intentional relinquishment of a known right.

*O'Neal v. O'Neal,* 284 Ala. 661, 227 So.2d 430, 431 (1969). At the time of plaintiff's delivery of the 365 shares, no conflict had arisen. There was no independent consideration, written agreement, or surrender by Merrill Lynch of any evidence of indebtedness.

Moreover, Alabama courts have expressly recognized that:

the employment of a broker to sell property for future delivery implies ... an undertaking to indemnify the broker in respect to the execution of his agency

... [and] a promise on the part of the principal to repay or reimburse him for such losses or expenditures as may become necessary or may result from the performance of his agency.

*Brower v. Fenner & Beane*, 237 Ala. 632, 188 So. 240, 242 (Ala.1939) (citations omitted).

■ Neither was there any breach of legal duty owed Limbaugh by Merrill Lynch in connection with the sale of the Golden Enterprises stock. Plaintiff was the record holder of the stock so that all information furnished by the company regarding the split would have been directed to him, and not to Merrill Lynch. The duty owed by the broker was simply to execute the order. *See Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D.Ala.1971), *aff'd*, 453 F.2d 417 (5th Cir.1972) (holding that there was no fiduciary relationship between commodities broker and his customer, and that broker owed no duty to communicate information which would affect customer's market position):

> The relationship of agent and principal only existed between plaintiff and defendant when an order to buy or sell was placed, and terminated when the transaction was complete. That is, defendant was a broker and nothing more ... defendant's duty, in the language of § 381 of the Restatement of Agency 2d ... is a duty to 'use reasonable efforts' to give the principal information relevant to the affairs entrusted to it. The affair entrusted to a broker who is to buy or sell through an exchange is to execute the order, not to discuss its wisdom.

Even if he owed Merrill Lynch, however, Limbaugh claims that Merrill Lynch was guilty of conversion and breach of contract when it liquidated his Ready Assets funds and charged his account for the money owed to it. Merrill Lynch contends that its removal of money from plaintiff's Ready Assets Trust account was not conversion because the account is a cash account and therefore cannot be converted, or alternatively, because it is a stock account upon which defendant held a valid lien. The district court held that defendant is entitled to prevail under either theory. We disagree and hold that summary judgment could not be granted to defendant on this record and remand to the district court.

The Ready Assets Trust account is a hybrid, with both cash and stock account characteristics. Defendant describes it as a no-load money market fund. The account contains shares, like a stock account. No certificates are issued, however, and the shares cannot be sold to third parties; they must be redeemed for cash. Moreover, checks may be written on the Ready Assets account for amounts in excess of $500. Purchase invoices evidence an investor's holdings in the account. Limbaugh's deposition indicated that he agreed to let the broker open the account after the broker "told me about a ready asset account that I could stick my money in and I wouldn't have to bring the money back down if I bought back, and said I could draw seventeen percent interest."

■ Generally, an action will not lie for the conversion of cash. Alabama courts have long recognized, however, that if the cash at issue is "specific money capable of identification," claims of conversion may be appropriate. *See Hunnicutt v. Higginbotham*, 138 Ala. 472, 35 So. 469 (1903); *Russell v. The Praetorians, Inc.*, 248 Ala. 576, 28 So.2d 786 (1947); *see also United States Fidelity and Guaranty Co. v. Bass*, 619 F.2d 1057, 1061 (5th Cir.1980). The theory behind this requirement derives from the fiction on which the action of trover was founded, that is, that the defendant had found the lost property of another. The money at issue must be "described with such reasonable certainty that the jury may know what money is meant and the defendants protected from another action based upon the same grounds" in a conversion action. *Russell*, 28 So.2d at 789.

■ When the Ready Assets Trust account is viewed in light of these rationales, it becomes apparent that the funds which it contains in the form of shares are sufficiently identifiable to support plaintiff's

conversion claims. We therefore need not determinatively classify the account as "cash" or "stock" for purposes of this action, since neither interpretation bars plaintiff's conversion claims.

■ Conversion requires "a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has ... the immediate right to possession." *Empiregas, Inc., of Gadsden v. Geary*, 431 So.2d 1258, 1260–61 (Ala.1983). The issue of whether defendant is liable for the tort of conversion depends upon whether Merrill Lynch's action was a proper exercise of a valid lien on the contents of the Ready Assets account.

■ Even if Merrill Lynch had a lien against the securities held in Limbaugh's account in the form of an interest in this Ready Assets Trust the record before us does not indicate that it had a right to remove plaintiff's funds without instituting any sort of action. The "Descriptive Notes and Regulatory Requirements" sheet which was forwarded to Limbaugh with the confirmation of the sale of the stock did put plaintiff on notice that:

> [i]n the event that the securities sold are not delivered to us by the indicated 'Date Due,' we will be required to purchase these securities within a reasonable time and to hold you responsible for any resulting deficiency.

There was no indication, however, that Merrill Lynch could use funds from the Ready Assets account to purchase the shares.

Typically, a lien arises out of an agreement between the parties, the terms of which may be consulted to determine their rights. No such agreement is present in the record before us. The contract entered into by the parties when the funds were invested in the Ready Assets Trust must be examined to determine whether it addressed Merrill Lynch's right to remove funds from the account to satisfy a customer's indebtedness on other transactions. If there exists no written contract, the contract implied from usual procedures with such accounts may be determinative. Absent an agreement granting Merrill Lynch the right to levy on the Ready Assets account without legal action in order to satisfy the prior indebtedness of the customer, the means employed by Merrill Lynch in reclaiming an amount equal to the value of the shares which plaintiff refused to deliver cannot be condoned. Summary judgment was improper on these facts.

The district court relied on the principle that "[a] stockbroker has in the absence of a special agreement to the contrary, a general lien on securities of the principal which come into his hands in the course of business," *Hopper v. J.H. Marschner & Co.*, 94 Colo. 475, 31 P.2d 321 (1934) (citing 9 C.J. at 665). The context in which this principle has been applied, however, is typically one where the broker, with the customer's knowledge and consent, consolidates two like accounts into one, *see, e.g., Hopper,* 31 P.2d at 322, advances his money to purchase securities for the customer, *see, e.g., New York Stock Exchange v. Pickard & Co.,* 274 A.2d 148 (Del.Ch.1971), or is dealing with a customer's margin account. *See, e.g., Hammon v. Paine,* 56 F.2d 19 (1st Cir.1932). When the parties operate on margin, there is an express or implied agreement as to the broker's use of the account funds to satisfy a customer's indebtedness. Brown, *Law of Personal Property,* § 118 at 586–87 (2d ed. 1955) ("where the stock broker and the customer conduct a continuous business and keep a running account or accounts ... *the arrangement undoubtedly contemplates* that the various items of stock held by the broker, as well as the margin deposited with him by the customer, shall be security for the balance of the general account due.") (emphasis added). In contrast, this case involves two distinct transactions: (1) Limbaugh's sale of 365 shares of Golden Enterprises, and (2) Limbaugh's investment of the proceeds of the sale in an interest-bearing account, which happened to be administered by Merrill Lynch.

■ In the absence of contractual authorization or some other legal right under

Alabama law, Merrill Lynch's removal of the Ready Assets funds was wrongful. Generally, a broker is required to institute a legal proceeding to recover the money owed him by a customer. In *Brower v. Fenner & Beane*, 237 Ala. 632, 188 So. 240 (1939), a broker sold some of his customer's stock at the customer's direction. The name of the shareholder remained on the list as the owner of record, however, and when the company paid dividends on the shares, they were sent to the customer rather than to the new owners of the stock. The brokers paid the owners the amount to which they were entitled, and then asked the defendant to return the dividends to them. He refused. The brokers sued and prevailed. In the opinion, the Alabama Supreme Court observed that "[t]o recover this money, the plaintiffs have properly resorted to the equitable action of *indebitatus assumpsit*, which is always available in cases like the present." 188 So. at 242. *See also, Erswell v. Ford*, 208 Ala. 101, 94 So. 67 (1922); Brown, *Law of Personal Property*, § 119 at 588 (2d ed. 1955):

> The possessory lien ... is simply a right on the part of the lienor to hold possession of the subject matter of the lien until the debt due him is paid ... [t]he lienor has no right to sell the subject matter of the lien to reimburse himself for his debt unless such is conferred expressly by statute or by special agreement between him and his debtor. The lienor may, by special agreement with the bailor-debtor, obtain the right to sell the goods being held, but the agreement must be strictly followed or conversion results.

Merrill Lynch contends that its lien attached to the Ready Assets Trust because it advanced part of the money used by the plaintiff to purchase shares in that trust. The cases dealing with brokers' advances, however, contemplate advances which are expressly or impliedly authorized by the customer. In fact, it is generally recognized that "[a] broker cannot recover money which he voluntarily advances in behalf of his employer without being expressly or impliedly requested to do so unless his principal subsequently ratifies such unwarranted action upon his part." 12 Am.Jur.2d *Brokers* § 239 (1964) (citation omitted). Here, both broker and customer were operating under the mistaken belief that the funds invested in the account belonged to the customer. There was no intent by Merrill Lynch to make an advance. It was only in retrospect that it became apparent that a portion of the money placed in Ready Assets represented the purchase price paid for the 182 shares of Golden Enterprises which were not delivered to the buyer. Merrill Lynch liquidated $2,725.00 of the account in order to supply the purchaser with the shares he had paid for after plaintiff refused to deliver them. Absent an understanding between the parties authorizing such action or some other facts or law not relied upon by the district court, Merrill Lynch should have employed usual legal processes to claim the reimbursement to which it was entitled after purchasing replacement shares for the buyer.

> The mere fact that a stockbroker has a lien for unpaid purchase money does not necessitate his having recourse [to property held by him in the capacity of a pledge] for the satisfaction of his claim, as he may institute an action for the recovery of the amount due.

12 Am.Jur.2d *Brokers* § 241 (1964) (citation omitted).

No case cited to this Court involved a broker's seizure of assets invested in a non-margin, money market type of account in order to satisfy a customer's prior indebtedness on a different transaction. While there is considerable authority to support a broker's exercise of a valid lien on securities he purchases for which a customer refuses to pay, or on the proceeds of securities he sells which the customer refuses to deliver, the facts of this case, concerning as they do the exercise of a lien on a customer's reinvestment of proceeds which were excessive due to mutual mistake, are different. It should be noted, however, that a broker converting property held by him in the capacity of a pledgee by

unlawfully selling the same has been held entitled to retain the amount of his lien. *See Farrar v. Paine,* 173 Mass. 58, 53 N.E. 146 (1899); *Otis v. Medoff,* 311 Pa. 62, 166 A. 245 (1933); *Minor v. Beveridge,* 141 N.Y. 399, 36 N.E. 404 (1894).

We make no observation as to whether Limbaugh could show any damage, even if he can demonstrate the validity of a technical cause of action. Since the Ready Assets account reflects an exact money value, he does not have the kind of damage that could occur if the defendant had liquidated securities of fluctuating value. In any event, these matters are not before us. Regardless of how fair or equitable the decision of the district court might be, it does not properly apply the Alabama law, as we understand it, and must be reversed and remanded for further proceedings.

Plaintiffs filed a motion to supplement the record with papers which defendant admits were submitted to the district court. Inasmuch as these documents were before the district court, the motion is GRANTED.

REVERSED and REMANDED.