[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 98 
Jo Ellen Hensley ("Jo Ellen") and Gold Rush Enterprises, Inc. ("GRE"), appeal from a judgment of the Morgan Circuit Court finding them liable to Don A. Poole on his claim alleging breach of fiduciary duty and denying their counterclaim alleging similar tortious conduct. Poole cross-appeals from the court's denial of his request for the imposition of a constructive trust.
 Facts and Procedural History
Dale Hensley ("Dale") incorporated Gold Rush Tax Services, Inc. ("Gold Rush"), a tax-return preparation business, in 1991. *Page 99 
He authorized the issuance of 5,000 shares of stock, and issued all of those shares to himself. In that same year, he hired Jo Ellen,[1] whom he had met when he was operating a similar business from an office located on property owned by Jo Ellen's father, Don A. Poole. In 1992, Dale transferred to Jo Ellen 10 percent of his stock in Gold Rush. Later Dale transferred to Jo Ellen an additional 35 percent of all issued stock in Gold Rush, giving her a total of 45% of all shares and keeping for himself the remaining 55%.
In late 1993, Dale sought to sell his 55% interest in Gold Rush. He suggested to Jo Ellen that she purchase his interest, but she lacked the money to do so. Poole, however, offered to pay Dale $20,000 for his 55% interest, and Dale accepted the offer. Poole suggested to Jo Ellen that she retain 70% of all issued stock and that he would have 30% of the stock. The agreement evidencing the sale of Dale's stock in Gold Rush, however, recites a transfer of Dale's entire remaining interest, 2,750 shares, to Jo Ellen; Poole is mentioned nowhere in the sales agreement.
After Dale transferred the 2,750 shares to Jo Ellen, in or around October 1993, she became not only the sole stockholder but also the president, treasurer, and secretary of Gold Rush. Through procedures not entirely clear from the record, Jo Ellen wound up with 70% of Gold Rush's stock, and Poole with 30%.
Once Jo Ellen became president and the sole director of Gold Rush, she and Poole jointly ran the business and sought to generate new customers. Jo Ellen owned the building in Decatur from which Gold Rush operated. Gold Rush later expanded to a second office in Athens, the operation of which was primarily entrusted to Poole. Each year, Gold Rush paid rent to Jo Ellen for the Decatur office.
Beginning in early 1994, Jo Ellen occasionally wrote checks on Gold Rush's account to Poole, sometimes specifying on the "For" line that the payments were for "loan repayment," other times stating that the checks constituted a disbursement to Poole of 30% of Gold Rush's profits, and other times not specifying a reason.
As the business grew, Jo Ellen hired several employees to work during the tax-preparation season. At one point she hired her husband, Wade Hensley,[2] as an employee. Wade performed functions similar to those of other employees and was compensated for his work.
In 1997, Poole visited the Decatur office while Jo Ellen was away. While he was there, he noticed bank statements indicating that Jo Ellen was receiving payroll checks from Gold Rush. Apparently, Jo Ellen had authorized a $45,000 salary for herself, as well as bonuses for two employees in the Decatur office. After Poole became aware that Jo Ellen was receiving a salary, Poole's attorney wrote a letter to Jo Ellen informing her that, under Poole's interpretation of their oral agreement, she was not to receive a salary in addition to her share of the profits. The relationship between Jo Ellen and Poole then chilled significantly. At the end of 1997, Jo Ellen demanded that Poole relinquish his 30% interest in Gold Rush. He refused.
In 1998, Poole and Dale entered into a joint venture, which they named "Tax Smart," performing substantially the same business as that performed by Gold Rush. *Page 100 
Poole openly solicited existing Gold Rush customers, although there is no indication in the record that he actually secured any of these customers.
From 1998 to 2000, Jo Ellen and Poole had virtually no contact. Jo Ellen continued to send Poole annually K-1 partnership schedules reflecting his 30% passive income allocations. On the other hand, she declared no dividends for those three years; thus, neither she nor Poole received any dividends. On May 8, 2001, Jo Ellen incorporated GRE. On May 22, 2001, she conducted a dissolution auction at Gold Rush's premises. Poole, having received a hand-delivered notice of this auction, attended. During the auction, Jo Ellen offered Poole all of the tangible assets of Gold Rush for the sum of $1.00. He declined. On December 18, 2001, Jo Ellen filed articles of dissolution to dissolve Gold Rush.
On February 11, 2002, Poole sued Jo Ellen and GRE, alleging three counts of breach of fiduciary duty: usurpation of corporate business opportunities, waste and misappropriation of corporate assets, and misappropriation of trade name. He later amended his complaint to seek the imposition of a constructive trust. Jo Ellen and GRE filed a counterclaim against Poole, alleging breach of contract, unjust enrichment, breach of good faith and fair dealing, tortious interference with a business relationship, various forms of fraud, and the tort of outrage, and requesting restitution, a constructive trust, and an equitable lien.
The trial court conducted a three-day bench trial, beginning on August 18, 2003, at which ore tenus evidence was presented. Seven months later, on March 29, 2004, the trial court entered an order concluding that Jo Ellen, both individually and on behalf of Gold Rush, had breached her fiduciary duty by misappropriating business opportunities and corporate assets. The court denied relief as to Poole's allegation that Jo Ellen and GRE misappropriated Gold Rush's trade name and denied Poole's request that the court impose upon GRE a constructive trust. In this latter denial of relief, the trial court specifically stated that "by virtue of his creation and operation of Tax Smart" Poole did not have "clean hands." The trial court also concluded that Jo Ellen and GRE failed to show that Poole had in any way injured Gold Rush, GRE, or Jo Ellen by his actions, consequently denying their counterclaim. Jo Ellen and GRE then timely filed a "motion to alter or amend said judgment," or, in the alternative, for a new trial, which motion the trial court denied on June 10, 2004. Jo Ellen and GRE appeal (case no. 1031504), and Poole cross-appeals (case no. 1031538).
 Standard of Review
In reviewing a trial court's findings of fact based on ore tenus evidence, this Court presumes those findings to be correct.Robbins v. Sanders, 890 So.2d 998, 1008-09 (Ala. 2004). However, the "`ore tenus rule does not extend to cloak a trial judge's conclusions of law . . . with a presumption of correctness.'" Ex parte Baron Servs., 874 So.2d 545, 549 (Ala. 2003) (quoting Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala. 1999)). Furthermore, "[t]he application of the clean hands doctrine is a matter within the sound discretion of the trial court." J M Bail Bonding Co. v. Hayes, 748 So.2d 198, 199
(Ala. 1999).
 Case No. 1031504 — The Appeal
Jo Ellen and GRE appeal two aspects of the trial court's judgment. First, they appeal its judgment insofar as it finds them liable for breach of fiduciary duty. Second, they appeal its judgment insofar as it denies their counterclaim. *Page 101 
 A. Statute of Limitations
Jo Ellen and GRE argue that the trial court erred in finding Jo Ellen liable for breach of fiduciary duty, because, they argue, Poole is barred by the two-year statutory limitations period from pursuing any of his breach-of-fiduciary-duty claims. Poole argues that the statute of limitations for such claims is six years.
Ala. Code 1975, § 6-2-38(l), provides:
 "All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."
In Norman v. Occupational Safety Association of AlabamaWorkmen's Compensation Fund, 811 So.2d 492, 497 (Ala. 2001), andSystem Dynamics International, Inc. v. Boykin, 683 So.2d 419,419 (Ala. 1996), this Court noted that a cause of action for breach of fiduciary duty sounds in tort and, for purposes of the statute of limitations, is governed by § 6-2-38(l). Because a two-year statute of limitations applies, argue Jo Ellen and GRE, the statutory limitations period on any viable cause of action Poole had expired well before he filed this action. Poole, however, argues that his breach-of-fiduciary-duty claim alleges conversion and that it is thus governed by the six-year statute of limitations found in Ala. Code 1975, § 6-2-34(3).
Even assuming, without deciding, that a six-year statute of limitations applies to actions for breach of fiduciary duty based upon conversion, we find that the trial court's judgment is nevertheless partially erroneous. Any allegation of conversion, to the extent one exists, concerns the conversion of money. This Court has held repeatedly that "`[g]enerally, an action will not lie for the conversion of money'" unless "`the money at issue is capable of identification.'" Campbell v. Naman's Catering,Inc., 842 So.2d 654, 659 (Ala. 2002) (quoting Greene County Bd.of Educ. v. Bailey, 586 So.2d 893, 898 (Ala. 1991)). Only when money is "earmarked" or otherwise identifiable, such as enclosed in a container like a bag or chest, does an action lie for conversion of money. Bailey, 586 So.2d at 898 (citing, e.g.,Holliday v. Hicks, 78 Eng. Rep. 878, 900 (Q.B. 1599)). InLewis v. Fowler, 479 So.2d 725, 726 (Ala. 1985), this Court recognized, by reference to Limbaugh v. Merrill Lynch, Pierce,Fenner Smith, Inc., 732 F.2d 859 (11th Cir. 1984), that "money directly traceable to a special account" — in the Limbaugh case a "Ready Assets Trust Account" — is sufficiently identifiable to support an action for conversion. See also Bailey,586 So.2d at 899. So long as accounts at financial institutions are "sufficiently segregated and identifiable," this Court will generally allow a conversion claim to proceed. Waddell Reed,Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1164
(Ala. 2003).
In the instant action, as Jo Ellen and GRE point out, Poole has not argued, nor has he provided any evidence indicating, that the money at issue was in any way segregated or identifiable. Rather, he claimed that he was simply due a 30% share and that Jo Ellen was limited to 70% of whatever profits Gold Rush distributed. Thus, we hold that the trial court erred to the extent that it found Jo Ellen liable for any conduct occurring more than two years before Poole filed his action.
The trial court, in its March 29 order, concluded that Jo Ellen breached her fiduciary duty to Poole in six different ways. Two of those were one-time events occurring within two years of Poole's filing his action. Specifically, on April 5, 2001, Jo Ellen allegedly used Gold Rush funds to pay for improvements or repairs to the *Page 102 
building in which the Decatur office was located (as to which she held title), and on December 18, 2001, she dissolved Gold Rush, thereby appropriating Poole's business opportunity. Both acts clearly occurred within the two years preceding the filing of Poole's action on February 11, 2002. Hence, we hold that, as to those two acts, the trial court did not err in holding that the claims predicated on those acts were not barred by the applicable statute of limitations. We therefore affirm the trial court's judgment as to those two breaches.
The remaining four ways in which Jo Ellen breached her duty to Poole involved multiple acts beginning more than two years before Poole filed his action and occurring intermittently throughout several years, the latter of the acts occurring within the two-year statutory limitations period. In other words, although some of the wrongful conduct alleged in this case occurred more than two years before Poole filed this action, other instances of that conduct occurred within the two-year time frame.
"Where multiple acts are involved, subsequent damages have been recognized as flowing from subsequent acts, and the fact that a limitations period may have expired as to an earlier act does not bar an action for the subsequent injury." Spain v. Brown Williamson Tobacco Corp., 872 So.2d 101, 114 (Ala. 2003). As to Jo Ellen's conduct, on her own or through Gold Rush, occurring outside the two-year statute of limitations governing this case, the trial court erred in finding her liable for such conduct. As to her conduct occurring within the statutory period of limitations, however, the trial court did not err in finding her liable.
The trial court first concluded that from 1997 until Gold Rush's December 18, 2001, dissolution Jo Ellen had breached her fiduciary duty by using Gold Rush funds to pay herself rent that was excessive and unreasonable. From 1997 to 2001, Jo Ellen received $132,000 from Gold Rush for rent of a building she owned that housed the Decatur office. One of Poole's experts calculated that the annual market rent for this building was $15,626, making the total overpayment of rent $53,870. Another of Poole's experts suggested that the rent overpayment during this time frame was $85,855. Jo Ellen and GRE's expert agreed that rent had been overpaid, concluding that Jo Ellen had been paid $67,185 in excess of the rent demanded by the market. The trial court, however, concluded that Jo Ellen had received excessive rent in the amount of $64,087. We cannot determine how the court arrived at this figure. It is not the number advocated by either party, not the average of the two numbers posited by Poole's experts, and not an average of all numbers posited.
The court next found that Jo Ellen breached her fiduciary duty by using Gold Rush funds to pay Wade excessive and unreasonable compensation from 1999 to 2001. For those years, Wade was paid a total of $174,154. We can find no evidence in the record indicating that any of Poole's experts specifically testified as to whether Wade's pay was excessive. At least, so far as those experts' calculations are presented, there is no specific line item revealing a computation indicating whether Wade's compensation was excessive.[3] One of Jo *Page 103 
Ellen and GRE's experts, however, did compute the amount he believed Wade had been overpaid, concluding that Wade had received $70,982 in excessive compensation. The court concluded that Wade's compensation for those three years had been excessive in the amount of $71,185. Again, we cannot determine the origin of this number.
The trial court's third conclusion was that Jo Ellen had breached her fiduciary duty in using Gold Rush funds to pay herself excessive and unreasonable salaries and dividends from 1996 to December 18, 2001. On this matter, Poole, on the one hand, and Jo Ellen and GRE, on the other, each introduced evidence from one expert concerning the degree to which Jo Ellen had been overpaid.[4] Patsy Bramlett, a vocational rehabilitation counselor testifying on behalf of Poole, stated that the average annual salary for a person in Jo Ellen's position was $23,525. From 1996 through 2001, Jo Ellen received a total of $572,252 in salary. According to Bramlett's calculations, the salary to which Jo Ellen was entitled for that same period was $141,150, thus yielding an overpayment of $431,102. The trial court concluded that Jo Ellen had overpaid herself by $168,129. Jo Ellen states in her brief to this Court that this figure was reached by adding together 30% of $431,102, that is, $129,330.60, and the "dividends" Jo Ellen failed to declare for 1998, 1999, and 2000. Yet we can find no evidence in the record as to the amount of dividends that should have been declared for those years; consequently, we are unaware how the trial court arrived at this figure.
Finally, the trial court concluded that Jo Ellen had breached her fiduciary duty by using Gold Rush funds to pay her personal credit-card charges from 1998 to 2001. The only evidence contained in the record concerning these credit-card expenses is a list, proffered by Poole, of some 16 purchases totaling $3,525.54, and another list, proffered by Jo Ellen and GRE, of some 94 purchases totaling $82,501.72, which they maintain are proper business expenses. The trial court concluded that Jo Ellen used Gold Rush funds to pay $4,201.70 during this period. Again, we cannot determine how the trial court arrived at this figure.
The basic problem presented by our inability to determine how the trial court arrived at the figures recited in its order is that we cannot determine with precision the exact evidence upon which that court relied in entering a judgment in Poole's favor. Without knowing what evidence the trial court was relying upon, we cannot determine with precision which specific acts the trial court judged to be wrongful. In turn, without knowing which acts were judged to be wrongful, we cannot determine which acts were committed within, and which acts were outside, the two-year statutory limitations period. Consequently, as to the statute-of-limitations defense, we affirm the trial court's conclusion that Jo Ellen was liable, but we remand this cause to the trial court for a determination of exactly which acts it judged to be wrongful. For every wrongful act that occurred before February 11, 2000 (two years before Poole filed his action), *Page 104 
we reverse the judgment of the trial court and instruct it to find in Jo Ellen and GRE's favor. For every act judged wrongful that occurred between February 11, 2000, and December 18, 2001, we affirm the judgment of the trial court as to the statute-of-limitations issue.
 B. Salary and Rent Paid to Jo Ellen
Jo Ellen and GRE's second argument on appeal is that the decision to pay Jo Ellen the salaries and rents she received was justified by the business-judgment rule. In keeping with our holding in Section A., supra, our analysis is confined to the salaries and rents paid to Jo Ellen from February 11, 2000, to December 18, 2001, i.e., within the two-year statute of limitations.
Jo Ellen and GRE argue that the decisions to use Gold Rush funds to pay Jo Ellen's compensation and rent were made in conducting Gold Rush's internal business affairs and are therefore protected by the business-judgment rule. Poole contests Jo Ellen and GRE's invocation of the business-judgment rule, arguing that Jo Ellen's compensation was excessive and unreasonable.
Alabama's business-judgment rule is stated best in Michaud v.Morris, 603 So.2d 886 (Ala. 1992):
 "`If in the course of management, directors arrive at a decision, within the corporation's powers . . ., for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interest of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss.'"
603 So.2d at 888 (quoting Roberts v. Alabama Power Co.,404 So.2d 629, 631 (Ala. 1981), quoting in turn H. Henn, Law ofCorporations § 242 (2d ed. 1970)).
Unless a court finds the existence of either bad faith or the absence of a "reasonable basis," a court is "loath to interfere" in the decisions of a business. Smith v. Dunlap, 269 Ala. 97,102, 111 So.2d 1, 4 (1959). However, a court need only conclude that one of those two conditions exists for it to disallow the defense and to assess the conduct of the business.
In its order, the trial court concluded that Jo Ellen, as director of Gold Rush, paid herself "excessive and unreasonable" rents and salaries. The court did not speak to whether Jo Ellen acted in good faith. Unless we conclude that the trial court erred in its finding that the salaries and rents paid to Jo Ellen were "excessive and unreasonable," we need not reach the issue of Jo Ellen's good faith or lack thereof.
In evaluating compensation under the business-judgment rule, our inquiry is "whether the compensation is so excessive that it bears no reasonable relation to the value of services rendered."Dunlap, 269 Ala. at 101, 111 So.2d at 4.
 "`To come within the rule of reason the compensation must be in proportion to the executive's ability, services and time devoted to the company, difficulties involved, responsibilities assumed, success achieved, amounts under jurisdiction, corporate earnings, profits and prosperity, increase in volume or quality of business or both and all other relevant facts and circumstances.'"
Dunlap, 269 Ala. at 101, 111 So.2d at 4 (quoting Gallin v.National City Bank of *Page 105 N.Y., 152 Misc. 679, 273 N.Y.S. 87, 114 (N.Y.Sup.Ct. 1934)).
Jo Ellen and GRE argue that the trial court erred in concluding that Jo Ellen used Gold Rush funds to pay herself excessive and unreasonable salaries. The evidence presented to the trial court by both sides was weighty and well documented by experts. Jo Ellen and GRE's experts argued that although Jo Ellen may have been paid more than she was worth in the latter years of Gold Rush's operation, this was to make up for earlier years in which she was underpaid. They also argued that although Jo Ellen received from Gold Rush rent in excess of the market rate for the building she owned, the cost per square foot was less than that charged by an independent third party with whom Jo Ellen and GRE had formerly dealt.
Poole's experts testified that the rent Jo Ellen charged Gold Rush was far in excess of the fair-market value. Concerning Jo Ellen's salary, they conceded that their analyses did not account for the fact that Jo Ellen was the office manager, an officer of the company, the controlling shareholder, and the sole director. They argued, however, that she was overpaid throughout her tenure as president of Gold Rush.
Although this Court might conclude otherwise were it reviewing this evidence for the first time, it is our practice to defer to the trial court's findings of fact where that court has conducted a hearing at which ore tenus evidence was presented. Thus, we are obliged to affirm the judgment of the trial court insofar as that judgment was based on its finding that the rents and salaries Jo Ellen paid herself were excessive. Therefore, we find the assertion of the defense of the business-judgment rule not well taken.
 C. Statute of Frauds
Jo Ellen and GRE next argue that the trial court erred in finding that Poole owned 30% of the stock of Gold Rush. Based upon this finding, the trial court ordered that Poole be awarded an amount equal to 30% of the total profits of Gold Rush, based on the amount of the salaries, dividends, and distributions Jo Ellen had received, which the trial court found to be 70%. Jo Ellen and GRE argue that Poole "loaned" Jo Ellen $20,000 to enable her to purchase Dale's interest in Gold Rush and that she subsequently repaid Poole. Even if the $20,000 was not a loan, however, they argue that because there was no written agreement between Poole and Jo Ellen to act as partners the Statute of Frauds would prevent the conclusion that they were partners.
Jo Ellen and GRE are correct that the Statute of Frauds renders void certain agreements not reduced to writing, and that one such agreement governed by the Statute of Frauds is one that, "by its terms, is not to be performed within one year from the making thereof." Ala. Code 1975, § 8-9-2(1). The problem with Jo Ellen and GRE's argument is that an oral agreement allocating a proportionate share of profits to each party carries within itself no guarantee that the venture they undertake shall endure for any length of time. That is, such an agreement could exist for one month before a fledgling partnership collapses, or it could last beyond a long lifetime. What is important to note is that "by its terms," an agreement to split money does not require performance beyond the one-year mark. Abbott v. Hurst,643 So.2d 589, 592 (Ala. 1994). Consequently, we find no merit in this argument, and we conclude that the trial court did not err in finding that Poole was a 30% shareholder in Gold Rush. *Page 106 
 D. Jo Ellen GRE's Counterclaim
The trial court wholly denied Jo Ellen and GRE's counterclaim. On appeal, Jo Ellen and GRE argue that the court erred in doing so. They first argue that the relationship between Poole and Jo Ellen was a confidential and special relationship and that his formation of Tax Smart while contemporaneously owning shares of Gold Rush constituted a breach of his fiduciary duty as a shareholder of Gold Rush. They next argue that Poole tortiously interfered with Gold Rush's contracts and its business. Finally, they argue that Poole fraudulently concealed from Jo Ellen the existence of Tax Smart.
A claim alleging breach of fiduciary duty sounds in tort,Brooks v. Hill, 717 So.2d 759, 764 (Ala. 1998), and "[a] necessary element to be proven in an action alleging breach of duty is damages." Williams v. Citizens Nat'l Bank of Shawmut,570 So.2d 635, 638 (Ala. 1990). Also, an essential element of a claim of tortious interference is damages. Parsons v. Aaron,849 So.2d 932, 946 (Ala. 2002). Finally, damages is a prerequisite element to finding a defendant liable for fraudulent concealment. Ex parte Liberty Nat'l Life Ins. Co.,797 So.2d 457, 465 (Ala. 2001). As Poole notes, Jo Ellen and GRE have failed to demonstrate any injury that is attributable to the creation and/or operation of Tax Smart. Jo Ellen and GRE argue that Poole caused business to be diverted from Gold Rush to Tax Smart, yet their citation to several pages in the record fails to substantiate this or to show any other circumstances occasioning damages. Rather, the citations indicate the following: that Poole "solicited existing [Gold Rush] clients for Tax Smart"; that Tax Smart competed for business with Gold Rush; that Wade had negotiated a contract between Gold Rush and Redstone Federal Credit Union, and at some point after this contract was negotiated, he left Gold Rush; that Jo Ellen trusted her father in 1993 and 1994; that Redstone Federal Credit Union declined to renew its contract with Gold Rush in July 2003 because of Poole's lawsuit; and that some 35% of Gold Rush's business is received from credit unions. This evidence does not establish that Poole, through Tax Smart, did any more than attempt to entice customers away from Gold Rush. In short, Jo Ellen and GRE point to no evidence indicating that Poole in any way succeeded in securing Gold Rush clients or that Redstone Federal Credit Union chose not to renew its contract with Gold Rush because it desired to have Tax Smart provide its services. Finally, Jo Ellen and GRE assert that Tax Smart "made profits of over $45,000." The materials in the record evidencing Tax Smart's profits indicate, however, that for tax years 1998 to 2002, the total profits hardly surpassed $4,500. Moreover, those materials in no way indicate that any business was diverted from Gold Rush to Tax Smart.
Assuming, for the sake of argument, that Poole owed a fiduciary duty, a duty not to interfere, and/or a duty to disclose a material fact to Jo Ellen and GRE, their counterclaim alleging breach of those duties must fail for want of proof of damages. We therefore affirm the judgment of the trial court as to Jo Ellen and GRE's counterclaim.
In conclusion, in case no. 1031504, we affirm the judgment of the trial court in the following respects: Jo Ellen and GRE are liable for the excessive rents and salaries paid by Gold Rush to Jo Ellen between February 11, 2000, and December 18, 2001, the date of the dissolution of Gold Rush. They are liable for dividends (if any) that should have been declared and paid to Poole between February 11, 2000, and December 18, 2001. They are liable for excess *Page 107 
compensation paid to Wade between February 11, 2000, and December 18, 2001. They are liable for funds used to pay Jo Ellen's personal credit-card bills between February 11, 2000, and December 18, 2001. They are liable for Gold Rush's payment to Jo Ellen for capital improvements made to the building on April 5, 2001. They are liable for dissolving Gold Rush and appropriating the business opportunities to GRE. Finally, we affirm the judgment of the trial court in all material respects in its denial of Jo Ellen and GRE's counterclaim.
We reverse the judgment of the trial court to the extent it entered judgment for Poole as to any conduct occurring before February 11, 2000, because as to any conduct occurring before that date his action is barred by the two-year statute of limitations. In order for the trial court to determine the proper amounts of damages to be awarded Poole, we remand the case.
 Case No. 1031538 — The Cross-Appeal
The trial court determined that Poole's conduct in forming Tax Smart while remaining a shareholder in Gold Rush resulted in his having "unclean hands," and it refused to impose a constructive trust upon the profits of GRE. Poole cross-appeals from this determination. Jo Ellen and GRE argue that the trial court was correct in determining that Poole's conduct evidenced unclean hands.
The trial court, in its order, stated:
 "[A]s to [Poole's] demand for the imposition of a constructive trust over the stock, assets and income of GRE, the Court is reasonably satisfied that [Poole] does not have `clean hands' by virtue of his creation and operation of Tax Smart, a competing business, and is not entitled, therefore, to such equitable relief."
Poole first argues that the trial court erred in awarding damages rather than imposing a constructive trust, contending that imposing a constructive trust would be a more equitable, not to mention more straightforward, remedy. Although we agree with Poole that the imposition of a constructive trust would not have presented to this Court the previously noted difficulties of reviewing the trial court's damages calculations, we disagree as to the equity of such a remedy.
As we have explained, "a constructive trust may not be imposed unless relief at law would be inadequate." Interstate TruckLeasing, Inc. v. Bender, 608 So.2d 716, 720 (Ala. 1992) (citingAmerican Family Care, Inc. v. Irwin, 571 So.2d 1053, 1061 (Ala. 1990)). Although Poole contends that the imposition of a constructive trust would be "more effective in providing a just result" and would have "rendered unnecessary any conjecture as to how to evaluate [his] loss of equity interest in the defunct corporation," Poole never argues or explains to this Court how the remedy actually afforded him by the trial court was inadequate. Because he fails to make such an argument, we conclude that the trial court did not err in denying Poole's request for the imposition of a constructive trust.
Further, in cases such as this, we have held that the imposition of a constructive trust is a remedy that is to be imposed in favor of the corporation. Morad v. Coupounas,361 So.2d 6, 10 (Ala. 1978); McKinstry v. Thomas, 258 Ala. 690,698, 64 So.2d 808, 813 (1953); see Ala. Code 1975, § 10-2B-14.05. Thus, for Poole to take advantage of such a remedy, his action should have been derivative in form. Because it was not, Poole has failed to demonstrate that he is entitled to the remedy.
 Conclusion
In case no. 1031504, the judgment of the trial court is affirmed in part, reversed in *Page 108 
part, and the cause is remanded to the trial court for proceedings consistent with this opinion. In case no. 1031538, the judgment of the trial court is affirmed.
1031504 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1031538 — AFFIRMED.
NABERS, C.J., and SEE, STUART, and BOLIN, JJ., concur.
[1] She was known at the time as Jo Ellen White. She became Jo Ellen Hensley when she married Wade Hensley, as hereinafter noted.
[2] Wade is Dale's first cousin.
[3] Dr. Gene Bryson, an expert witness testifying on behalf of Poole, was asked to place a value on Gold Rush as a business. In so doing, he generated a spreadsheet that accounted for certain variables. One of these variables was "above-market salaries." Neither the spreadsheet nor Dr. Bryson's testimony definitively indicates whether the spreadsheet accounted for all "above-market salaries" or only those of a particular individual, such as Jo Ellen or Wade.
[4] As noted in footnote 3, supra, Dr. Bryson prepared a spreadsheet reflecting "above-market salaries." Because we have no indication whether this line item concerns only Jo Ellen or all above-market salaries paid by Gold Rush, and because neither party suggests the weight to be accorded to this evidence, we do not consider this evidence in evaluating whether Jo Ellen's compensation was excessive.