**CITRONELLE–MOBILE GATHERING, INC., Citmoco Services, Inc., Plaintiffs–Counterclaim–Defendants,**

**Bart B. Chamberlain, Jr., Plaintiff–Counterclaim–Defendant–Appellant,**

v.

**James D. WATKINS, etc., et al., Defendants–Appellees,**

**United States of America, Defendant–Counterclaim–Plaintiff–Appellee,**

**Douglas Oil Purchasing Company, Inc., Counterclaim–Defendant.**

Nos. 90–7731, 91–7244.

United States Court of Appeals, Eleventh Circuit.

Oct. 4, 1991.

Victor T. Hudson, William Watts, III,
Reams, Vollmer, Philips, Killion, Brooks &
Schell, P.C., Jeffrey Harris, Rubin, Win-
ston, Kiercks & Harris, Washington, D.C.,
for Chamberlain.

Gilbert T. Renaut, Office of Chief Counsel for Enforcement, Economic Regulatory Admin., Dept. of Energy, Washington, D.C., for Dept. of Energy.

Ruth A. Harvey, U.S. Dept. of Justice, Washington, D.C., for U.S.

Charles P. Adams, Jr., Brunini, Grantham, Grower & Hewes, Jackson, Miss., for Knostman.

Before TJOFLAT, Chief Judge, HATCHETT, Circuit Judge, and HENDERSON, Senior Circuit Judge.

HATCHETT, Circuit Judge:

This is an appeal brought by the principal shareholder of several corporations seeking to overturn the district court's orders holding him in contempt of court and imposing strict sanctions. We affirm.

### FACTS

During the Arab oil embargo, between December 20, 1973, and May 26, 1974, Bart B. Chamberlain, Jr., Citronelle–Mobile Gathering, Inc. (Citronelle), and Citmoco Services, Inc. (Citmoco) (collectively, judgment debtors) exported four crude oil shipments for refining to the Grand Bahamas Petroleum Co., Ltd. (Petco), a Bahamian corporation and the New England Petroleum Corporation's wholly owned subsidiary (Nepco).[1] After refining, the judgment debtors sold the oil to Nepco for resale to United States customers. The first three shipments were sold for $14 per barrel and the final shipment for $13 per barrel, which were higher prices than the judgment debtors could have charged had the sales been made directly to United States purchasers. Subsequently, the Department of Energy (DOE) found that the crude oil sales were subject to price controls under section 209 of the Economic Stabilization Act of 1970,

12 U.S.C. § 1904 note (1976 ed.), as incorporated by section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1) (1976 ed.).

In 1977, the judgment debtors brought a declaratory and injunctive relief action against the DOE and the Department of Commerce (DOC) alleging that they exported crude oil to the Bahamas pursuant to validly issued export licenses, which exempted the oil from DOE price and allocation controls. The DOE and DOC (government) counterclaimed seeking restitution for alleged overcharges resulting from the crude oil transfers. Thereafter, both parties sought summary judgment.

The district court ruled that (1) the judgment debtors violated the 1970 Economic Stabilization Act, Emergency Petroleum Allocation Act, and various other statutes which regulated ceiling prices for crude oil sales; (2) the federal agencies reviewed and approved the export licenses; (3) Chamberlain acted as a central figure and was personally liable to the extent he profited; (4) the judgment debtors dealt with the federal agencies in good faith; (5) the judgment debtors should restore funds to the United States Treasury; and (6) no penalties should be assessed. *Citronelle–Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871 (S.D.Ala.1980). Thus, the district court granted the government partial summary judgment, and the judgment debtors sought an interlocutory appeal.

On appeal, the Temporary Emergency Court of Appeals affirmed, but held that payment to the United States Treasury did not satisfy the statutory obligation to make restitution. Accordingly, the Temporary Emergency Court instructed the district court to determine the proper restitution amount and distribution method. *See Citronelle–Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (Temp.Emer.Ct.App.), *cert. denied*, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982).

---

1. During this time, Citronelle operated an oil field and pipeline in southwest Alabama, and Citmoco operated a terminal facility in Citronelle's field. Chamberlain owned 90 percent of Citronelle and 87.5 percent of Citmoco, which equaled the largest working interest in the Citronelle field among 900 owners. *See, Citronelle–Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871 (S.D.Ala.1980) for detailed fact findings.

On remand, the district court found Chamberlain personally liable for $138,958.88, the amount of profit reported on his 1974 state and federal tax returns. The district court subsequently reduced that amount to $53,461.88 after finding that Chamberlain had personally paid $85,497 in state and federal income taxes on sale generated profits. Neither party agreed with this ruling; consequently, both appealed.

The Temporary Emergency Court found that Chamberlain's central figure status made him personally liable for full restitution, amounting to $6,769,956.76 plus prejudgment interest. *See Citronelle–Gathering, Inc. v. Harrington*, 826 F.2d 16, 31 (Temp.Emer.Ct.App.1987). On November 30, 1988, the district court entered a final judgment against the judgment debtors for $19,401,720.47 plus interest and costs. Currently, Chamberlain's debt to the United States exceeds $21,000,000.

Subsequently, the government made repeated informal attempts to collect the funds on the overcharged customers' behalf. When these efforts failed, it initiated discovery by serving Chamberlain with interrogatories and requests for production of documents. Chamberlain did not answer the interrogatories or produce documents.

In August or September, 1989, Chamberlain absconded to Switzerland and began removing his assets from the court's territorial jurisdiction by using Douglas Trading Bahamas, Ltd. (Douglas Trading), a foreign corporation which Chamberlain and his wife jointly owned, and by transferring Citronelle and Citmoco's assets into his solely owned corporation, Douglas Oil Purchasing Company, Inc. (Douglas Oil). The transferred assets included undeclared "dividends" to Chamberlain (such as an airplane belonging to Douglas Oil which he sold and deposited the proceeds in his personal foreign bank account), "suspense funds," and "temporary cash investments." Chamberlain also continued to control a vessel named "Miss Boots" located in the Bahamas, claiming that he was enforcing a lien.

## PROCEDURAL HISTORY

On September 27, 1989, the government sought an *ex parte* temporary restraining order (TRO) preventing the judgment debtors, Douglas Trading, and Douglas Oil from transferring assets. On September 28, 1989, the district court granted the TRO and enjoined Chamberlain from

encumbering, selling, transferring, damaging, destroying, or taking any action which impairs or tends to impair the value of any real and/or personal property including but not limited to cash and any other tangible or intangible assets, in the ownership, custody or control of Douglas Oil, except as necessary for the purchase, sale, or transportation of oil as conducted in the normal course of business.

On October 30, 1989, the government requested the appointment of a Receiver and an order compelling Chamberlain to return transferred assets to the court's jurisdiction. On February 14, 1990, the district court granted the government's motion and appointed a Receiver to possess and control Chamberlain's and the other judgment debtors' assets, including Douglas Oil and Douglas Trading. The order specifically allowed the Receiver "to assume all the rights Chamberlain enjoyed incident to his 100% stock ownership in Douglas Oil," which included the ability to obtain and return assets outside the country. Even after the entry of this order, Chamberlain continued to frustrate the government's discovery and the Receiver's authority. Consequently, the Receiver moved for an order to show cause and a civil contempt judgment for Chamberlain's failure to comply with the court's September 28, 1989, and February 14, 1990, orders.

On June 29, 1990, the district court ordered Chamberlain to respond to the government's interrogatories and requests for the production of documents, to deliver Douglas Oil's stock certificates, and to attend a debtor's examination on July 19, 1990. In response to a government motion, on August 21, 1990, the district court issued an order directing that Chamberlain

and his counsel appear on September 14, 1990, to show cause why Chamberlain should not be held in contempt.

Because Chamberlain failed to comply with its orders, on September 18, 1990, the district court held Chamberlain in civil contempt for failing to (1) respond to interrogatories and requests for the production of documents; (2) produce the stock certificates for Douglas Oil and Douglas Trading; and (3) appear for the debtor's examination as stated in its June 29, 1990, order. Accordingly, the court held that until Chamberlain complied with its orders, he (1) could not participate in court proceedings related to this matter, (2) waived any objections to collection efforts, (3) would pay all reasonable expenses and attorney fees, and (4) should surrender to the United States Marshal.

On October 29, 1990, after finding that Chamberlain continued to interfere with the Receiver and did not intend to obey its orders, the court once again found Chamberlain in contempt and issued an order enumerating his contemptuous acts, which included removing and converting assets. Thus, on February 29, 1991, the court issued sanctions prohibiting (1) Chamberlain from using any assets from the joint debtor companies, including Douglas Oil and Douglas Trading, (2) Chamberlain from using any funds or assets "whether or not exempt from execution," and (3) the clerk of court from accepting any filing or papers on Chamberlain's behalf. The order also ordered banks or financial institutions "wherever located" to freeze the judgment debtors' assets. Chamberlain now appeals the court's contempt finding and imposition of sanctions.

## ISSUES

On appeal, Chamberlain raises the following issues: (1) whether the district court properly found him in contempt; and (2) whether the district court erred in imposing sanctions.

## CONTENTIONS

Chamberlain contends that the district court abused its discretion in finding him in contempt for violating the TRO and the order appointing a Receiver. He argues that no evidence demonstrates that he transferred property after the TRO's effective date, and the district court's sanctions offend principles of fairness and due process.

The government contends that the district court ruled correctly on all issues.

## DISCUSSION

### I. Contempt Findings.

We review the district court's civil contempt findings under an abuse of discretion standard. *United States v. Roberts*, 858 F.2d 698, 700 (11th Cir.1988). Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966).

In this case, the government established clearly and convincingly that Chamberlain violated the district court's orders. *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990). Once it made this *prima facie* showing, the burden of production shifted to Chamberlain to produce evidence explaining his noncompliance. *United States v. Rylander*, 460 U.S. 752, 755, 103 S.Ct. 1548, 1551, 75 L.Ed.2d 521 (1983). In satisfying this burden, Chamberlain had to offer proof beyond "a mere assertion of inability" and introduce evidence supporting his claim. *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir.1984). Parties subject to a court's order demonstrate an inability to comply only by showing that they have made "in good faith all reasonable efforts to comply." *United States v. Ryan*, 402 U.S. 530, 534, 91 S.Ct. 1580, 1583, 29 L.Ed.2d 85 (1971). The district court initially determines whether an alleged contemnor possesses the ability to comply, and its factual finding is subject to the clearly erroneous standard of review. *Roberts*, 858 F.2d at 701.

Chamberlain did not satisfy his burden of production. The district court found

that he committed five specific acts which violated its orders: he (1) willfully disobeyed the TRO and unreasonably interfered with the Receiver's attempts to enforce the appointment order; (2) wrongfully converted monies in temporary cash investments violating the TRO and the Receiver appointment order; (3) wrongfully converted suspense funds which he held for Douglas Oil violating the TRO and the Receiver appointment order; (4) wrongfully converted the proceeds from the aircraft sale, which Douglas Oil owned; and (5) wrongfully refused to turn over the "Miss Boots" to the Receiver.

### A. Willful Interference.

The district court gave Chamberlain numerous opportunities to comply with its orders and explain his conduct. In February, 1989, the government submitted interrogatories and requests for production of documents. Chamberlain did not answer. More than a year later, the district court ordered Chamberlain to respond to the government's interrogatories and other discovery. Again, Chamberlain did not answer. Because Chamberlain did not comply with the order, the district court issued an order informing Chamberlain and his counsel that it had scheduled a show cause hearing, at which Chamberlain could demonstrate why he should not be held in contempt. Chamberlain did not attend the hearing. He has repeatedly ignored and disobeyed the court's orders. Nevertheless, he claims that the district court abused its discretion in finding him in contempt and imposing sanctions upon him.

Chamberlain disingenuously argues that the court's orders never instructed him to return assets, deliver assets, or aid the Receiver. It is undisputed, however, that the appointment order empowered the Receiver to possess and control Chamberlain's assets and assume rights Chamberlain enjoyed incident to his stock ownership in Douglas Oil. Additionally, instead of obeying this order, Chamberlain opted to inten-

tionally disobey it in transferring, secreting, and converting assets placed under the Receiver's control.

### B. Conversion.

The district court ruled that Chamberlain had converted corporate assets. Conversion entails a wrongful taking or detention, an illegal ownership assumption, or illegal use of another's property. *Covington v. Exxon Co. U.S.A.*, 551 So.2d 935, 937 (Ala. 1989). It also includes wrongfully exercising dominion over another's property in exclusion of the owner's rights, where the owner has an immediate possession right. *Limbaugh v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 732 F.2d 859, 862 (11th Cir.1984).

Chamberlain contends that he transferred his assets prior to the court's orders. Although he may have moved assets prior to issuance of the court's orders, the corporations did not declare dividends or liquidate the companies prior to the orders. *See First National Bank of Birmingham v. Perfection Bedding Co.*, 631 F.2d 31, 33 (5th Cir.1980) (shareholders have no vested rights in the corporation's assets until a distribution occurs).[2]

Additionally, Chamberlain's companies customarily record all business transactions, including distributions made to shareholders and payments made to staff. Officers of the judgment debtor corporations testified that ordinarily the business records listed transfers and dividends, and corporate meeting minutes routinely recorded transfers. No such records or minutes exist for the transfers Chamberlain claims. Thus, he did not transfer assets before the district court issued the TRO and Receiver order. Accordingly, he disobeyed such orders by converting those assets.

#### 1. Suspense Funds and Temporary Cash Investments.

In considering the suspense funds and temporary cash investments, a conversion action ordinarily lies when cash is "specific

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all former Fifth Circuit deci-

sions issued before close of business September 30, 1981. *Bonner,* 661 F.2d at 1209.

and capable of identification." *Covington*, 551 So.2d at 938. "Money in any form is generally regarded and treated as property, and it is well settled that an action will lie for the conversion thereof, where there is an obligation to keep intact and deliver the specific money in question, and where such money can be identified." *Lewis v. Fowler*, 479 So.2d 725, 726 (Ala.1985).

The Receiver showed that the suspense funds existed in Chamberlain's trust and were held specifically for Douglas Oil.[3] Although Chamberlain presented bank records in an effort to prove that he made valid transfers, the district court found that this evidence only proved that he transferred $8.5 million to his personal account, but did not support his contention that the temporary cash investments funds were part of the transfer. Likewise, the temporary cash investments constituted $2.5 million in Douglas Oil's account. When the court appointed the Receiver, this amount remained on Douglas Oil's books. Thus, the cash in question was sufficiently identifiable to be the subject of conversion and to support the district court's contempt finding. Because the accounts were readily identifiable in that they were both held for specific purposes, the district court correctly found that Chamberlain had converted funds. Moreover, even if the funds were not segregated, in certain instances commingled funds which should have been kept separate may be the subject of a conversion. *See Matter of Wholesale Furniture Mart, Inc.*, 24 B.R. 240, 243 (W.D.Mo.1982).

### 2. Aircraft Sale.

In the district court, Chamberlain proved that he deposited the aircraft sale proceeds in his personal account. He neglected, however, to present any evidence that this was a properly awarded dividend; therefore, the asset remained the corporation's property. After appointment, the Receiver had an immediate possession right to the proceeds, and Chamberlain's refusal to return after request constituted a conversion. *Barnes v. Barnhart*, 420 So.2d 282, 284 (Ala.1982).

Chamberlain correctly asserts that a conversion does not occur when a person takes only that to which he is entitled. 89 C.J.S. *Trover and Conversions* § 39 at 548. He is incorrect, however, in asserting that he was entitled, as sole shareholder of Douglas ·Oil, to sell corporate assets at will. Furthermore, once the court appointed the Receiver, Chamberlain lost control of the corporation's assets even though he was the principal shareholder. Thus, because the corporation did not declare a dividend consisting of the aircraft and the corporation's books do not reflect any other legitimate payments to Chamberlain, he converted the aircraft sale proceeds.

### 3. "Miss Boots."

Next, Chamberlain claims that he merely asserted a maritime lien on "Miss Boots" for services and other necessities which existed prior to entry of the TRO. In his view, this action constituted nothing more than a notification to the Receiver of a preexisting encumbrance on the vessel which could not have affected the vessel's status or value. Accordingly, Chamberlain argues that these actions were not in disobedience of the court's orders or done to frustrate the Receiver in carrying out his duties.

Chamberlain, however, does not present any contractual right to retain the vessel, nor did he institute legal proceedings to recover the funds allegedly owed to him. We have held that where no contractual or legal right exists, refusal to return property after demand constitutes conversion. *See Limbaugh*, 732 F.2d at 863–64. Even if we assumed that Chamberlain at an earlier time properly possessed the vessel, upon appointment of the Receiver, the Receiver had authority over it and the lien. More-

---

**3.** Douglas Oil's suspense fund obligation related to oil it purchased from the Citronelle Unit. In cases where it is not clear who sold the oil to Douglas Oil, the company held the funds it would have paid to the oil sellers until title cleared. If ownership was not established in seven years, the funds escheated to the state of Alabama under its unclaimed property act. *See generally Citronelle–Mobile Gathering, Inc. v. Boswell*, 341 So.2d 933 (Ala.1977).

over, the lien proceeds would be used to partially satisfy the debt owed to the government. See 31 U.S.C. § 3728.

Thus, Chamberlain has refused to turn over control of assets to the Receiver, to comply with discovery, and to explain his willful and disobedient conduct. Because Chamberlain clearly and convincingly violated the district court's TRO and the Receiver appointment order without explanation, the district court properly found him in contempt. In fact, such a finding was virtually compelled.

## II. Sanctions.

■■■ The district court's civil contempt sanctions are reviewed under an abuse of discretion standard. See Matter of Trinity Industries, Inc., 876 F.2d 1485, 1493 (11th Cir.1989). The court has the power to impose coercive and compensatory sanctions. In re Chase and Sanborn Corp. v. Nordberg, 872 F.2d 397 (11th Cir.1989). " 'The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief. This may entail the doing of a variety of acts....' " EEOC v. Guardian Pools, Inc., 828 F.2d 1507, 1515 (11th Cir.1987) (quoting United States v. United Mine Workers, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947)). When fashioning a sanction to secure compliance, a district court should consider " 'the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired.' " EEOC, 828 F.2d at 1515 (quoting United Mine Workers, 330 U.S. at 304, 67 S.Ct. at 701).

■■■ Sanctions may be imposed to coerce the contemnor to comply with the court's order, but may not be so excessive as to be punitive in nature. Matter of Trinity, 876 F.2d at 1493. The court's discretion, however, "must stay within the bounds of due process." Mercer v. Mitchell, 908 F.2d 763, 766 (11th Cir.1990). Due process requires that the court inform the alleged contemnor of the contemptuous conduct, and provide a hearing in which the alleged contemnor may explain why the court should not make a contempt finding. Mercer, 908 F.2d at 767. Although the district court has the authority to impose sanctions designed to ensure compliance, the sanctions cannot be any greater than necessary to ensure such compliance. Mercer, 908 F.2d at 768 n. 9.

The district court had numerous options, among them: a coercive daily fine, a compensatory fine, attorney's fees and expenses to the Receiver, and coercive incarceration. Matter of Trinity, 876 F.2d at 1494; EEOC, 828 F.2d at 1516; Sizzler Family Steak Houses v. Western Sizzlin Steak House, 793 F.2d 1529, 1535–36 (11th Cir.1986); Shillitani, 384 U.S. at 371, 86 S.Ct. at 1536.

Chamberlain argues that the district court's September 18, 1990, sanctions serve as a "gag order" and punishment for his noncompliance, and therefore violate principles of due process and fairness.[4] We, however, find these sanctions within the district court's authority.

■■■ When Chamberlain refused to comply with the court's authority, he chose not to attend hearings, or participate in discovery, or present reasons which explained his behavior. Yet, now he urges this court to conform to his wishes, without explaining his contumacious conduct. Chamberlain cannot ignore the court's orders and benefit from them in this court.[5]

---

4. He specifically contests the following sanctions:

  until Bart B. Chamberlain, Jr., complie[d] fully and completely with the Court's Orders:
  1. Chamberlain may not file objections or motions, or participate in *any* manner, either directly or indirectly, in any proceedings before this Court related to the sale or distribution of any assets belonging to him, any entity in which he has an interest or any third party.

  2. Chamberlain has waived all objections to any lawful actions undertaken by the Receiver or the United States in their efforts to collect the judgment in this action.

5. In a criminal context, it is well settled in this circuit that a defendant who flees after conviction but before sentencing abandons or waives his right to appeal from the conviction unless he can establish that his absence was due to matters completely beyond his control. *United*

Also, we have interpreted Federal Rule of Civil Procedure 37 as giving district courts "broad, yet not unbridled, discretion in imposing sanctions." *Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 799 F.2d 1510 (11th Cir.1986); *see also Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.1986); *Jaffe v. Grant,* 793 F.2d 1182 (11th Cir.1986).

Rule 37(b)(2)(B) provides:

(b) Failure to comply with order.

(2) *Sanctions by court in which action is pending.* If a party or an officer, director, or managing agent of a party or a person designated under rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or rule 35 or if a party fails to obey an order entered under rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just and among others the following:

. . . .

(B) an order refusing to allow the disobedient party to support or oppose designated claims or defenses or prohibiting that party from introducing designated matters in evidence[.]

*States v. Holmes,* 680 F.2d 1372, 1373 (11th Cir.1982). In this case, although not in a criminal setting, Chamberlain had his day in court, neglected to utilize it, and cannot now seek refuge from that same court while remaining in contempt.

**6.** Chamberlain objects to the following paragraphs in the February 20, 1991, order:

4. Chamberlain and counterclaim-defendants, their officers, agents, servants, employees and any persons in active concert or participation with them receiving actual notice of this Order are PROHIBITED from expending or transferring in any fashion, by sale, gift or otherwise, or from hereafter receiving or obtaining the benefit of any funds or assets owned by Chamberlain or the counterclaim-defendants without the prior written consent of the Receiver or the Court. Chamberlain shall not make any payment of fees or expenses from assets subject to this Court's Orders, without prior approval of the Court.

. . . .

6. Banks or financial institutions, wherever located, holding funds or assets of Chamberlain or any of the counterclaim-defendants

This rule and our cases support the district court's sanctions: rule 37(b)(2)(B) expressly authorized the district court to refuse to allow Chamberlain to defend these actions until he obeys the previous orders. In previous cases, we have affirmed dismissals and default judgments which are much more extreme sanctions than those imposed here. *Navarro v. Cohan,* 856 F.2d 141 (11th Cir.1988); *Buchanan v. Bowman,* 820 F.2d 359 (11th Cir.1987). Therefore, we find the sanctions imposed in this case within the district court's discretion. Accordingly, the court's September 18, 1990, sanction order is interpreted to permit Chamberlain to participate in this case, once he respects the court's authority and complies with its orders.

Chamberlain also challenges the district court's February 20, 1991, sanctions order.[6] Because we find all these sanctions merely coercive and well within the district court's broad authority, we will only address those prohibitions which deserve clarification. First, Chamberlain argues that the prohibition on filing papers with the court violates due process. Due to the circumstances in this case, we interpret this prohibition to allow Chamberlain to file any pleadings with the court unrelated to this matter, but he may not file papers in the court related

are hereby ORDERED to freeze such funds or assets and report same to the Receiver and turn them over to the Receiver. Any such financial institutions shall not assist or participate in any transfer or expenditure of funds or assets by Chamberlain or his agents, including the honoring of checks, drafts or other transfer instructions.

. . . .

10. The Clerk of the Court shall refuse to accept any papers attempted to be filed by or on behalf of Chamberlain in this matter as long as he remains in contempt of this Court's Orders.

11. Until such time as he has purged himself of contempt, Chamberlain is hereby ORDERED not to spend or dispose of any funds or assets hereafter, whether or not exempt from execution. Any third parties receiving any such payment or transfer with notice of the contempt Order and this Order are hereby ORDERED to immediately turn such funds or property over to the Receiver.

**1306**

to this matter until he complies with the court's orders.

Chamberlain also objects to the court's sanction which prohibits him from spending or disposing of assets, "whether or not exempt from execution." We interpret this prohibition as a mere restatement of the Receiver's complete control over Chamberlain's assets. This, like the other sanctions, serves as yet another coercive measure intended to compel Chamberlain's compliance with the court's orders. Moreover, Chamberlain has never established that any of his property is exempt from execution. Thus, because he has never established that any exempt property exists, his objection to the sanction has no foundation and is premature.

For the foregoing reasons, we hold that the district court did not abuse its discretion in finding Chamberlain in contempt and in imposing sanctions. The district court is affirmed.

AFFIRMED.