**TRACFONE WIRELESS, INC., Plaintiff,**

v.

**TECHNOPARK CO., LTD., et al.,**

**CASE NO.: 1:12-cv-20013-UU**

United States District Court, S.D. Florida.

Signed March 17, 2016

Filed March 18, 2016

James Blaker Baldinger, Carlton Fields PA, West Palm Beach, FL, Steven Jeffrey Brodie, Aaron Stenzler Weiss, Carlton Fields Jorden Burt, P.A., Miami, FL, for Plaintiff.

Christopher Kevin Leigh, Christopher K. Leigh, P.A., Fort Lauderdale, FL, Milla L. Lvovich, Terry A. Szucsko, Lvovich Volchegursky & Szucsko, LLP, San Francisco, CA, Yasir Billoo, Golden & Grimes, LLP, Miami, FL, for Defendants.

### ORDER GRANTING TRACFONE'S MOTION TO REOPEN CASE TO ENFORCE VIOLATION OF PERMANENT INJUNCTION

URSULA UNGARO, UNITED STATES DISTRICT JUDGE

This matter is before the Court on Plaintiff TracFone Wireless, Inc.'s ("TracFone"), Motion to Reopen Case to Enforce Violation of Permanent Injunction (the "Motion") [D.E. 110] against Defendant Technopark Co., Ltd. ("Technopark"). Upon review of the Motion and the supporting record, the Motion is **GRANTED.**

*INTRODUCTION*

In the Motion, TracFone seeks an order (1) reopening this case with respect to Defendant Technopark to enforce Technopark's violations of a the Partial Final Judgment and Permanent Injunction, which this Court entered against it on April 9, 2012 (the "Permanent Injunction") [D.E. 64]; (2) finding Technopark in contempt for its violations of the Permanent Injunction; and (3) permitting TracFone to conduct expedited discovery in order to ascertain the amount of damages to be awarded to TracFone as a result of Technopark's violations.

The Court has reviewed the several declarations on which TracFone relies in support of its Motion, and finds them to be consistent with one another and otherwise credible. Accordingly, as set forth below, the Court makes several findings of fact and conclusions of law based upon the declarations and the authority cited in TracFone's Motion.

*FINDINGS OF FACT*

### Details of Defendants' Fraudulent Scheme

The Court finds that TracFone has sufficiently established that Technopark has been engaging in the same conduct prohibited by the Permanent Injunction by selling devices capable of unlocking bulk quantities of TracFone telephones in violation of TracFone's rights.

### A. Procedural History

On January 4, 2012, TracFone filed a complaint for damages and injunctive relief ("Complaint") against Technopark, as well as other parties that asserted statutory and common law claims against Technopark in the Complaint.

The Court previously found that Technopark failed to respond to the Complaint or otherwise appear, and, as such, was defaulted. [D.E. 50]. Thereafter, on April 4, 2012, TracFone moved for the Entry of Partial Final Judgment and Permanent Injunction against Technopark. [D.E. 58]. The Court found that TracFone, in its April 4, 2012 motion, established that Technopark admitted all of the allegations set forth in TracFone's Complaint, because Technopark failed to answer or otherwise respond to it. Accordingly, on April 9, 2012, the Court entered a Partial Final Judgment and Permanent Injunction, [D.E. 64], which prohibits Technopark from, *inter alia:*

- possessing or trafficking in any devices used to unlock and reflash TracFone Prepaid Phones;

- possessing or trafficking in certain instrumentalities that avoid, bypass, remove, disable, deactivate, or otherwise impair the technological measures within the TracFone Prepaid Software that effectively control access to the proprietary TracFone Prepaid Software;

- accessing, altering, erasing, tampering with, deleting or otherwise disabling TracFone's proprietary prepaid cellular software contained within any model of TracFone Prepaid Phones;

- facilitating or in any way assisting other persons or entities who Technopark Co., Ltd. knew or should have known are engaged in reflashing and/or unlocking TracFone Prepaid Phones and/or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in TracFone Prepaid Phones;

- facilitating or in any way assisting other persons or entities who Technopark Co., Ltd. knew or should have known are engaged in any of the acts prohibited under this Permanent Injunction including, without limitation, the buying and/or selling of unlocked TracFone Prepaid Phones; and,

The Court has reviewed TracFone's counsel's statements regarding TracFone's service of the Permanent Injunction upon Technopark. *See* Declaration of TracFone's outside counsel, Aaron S. Weiss, executed February 25, 2016 (the "Weiss Declaration") at ¶¶ 10–12 (explaining TracFone's diligent efforts to serve Technopark and attaching proof thereof in the form of FedEx shipping confirmations). Accordingly, the Court finds that TracFone has established that it served the Permanent Injunction upon Technopark by FedEx on April 14, 2012, in

accordance with this Court's order authorizing it to do so. [D.E. 9 at pp. 10–11].

The Court also notes that Permanent Injunction entered against Technopark retains "jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of this Permanent Injunction or the parties' settlement," and provides for a penalty if Technopark were to be found in violation of its terms:

> If Technopark violates the terms of this Permanent Injunction, TracFone shall be entitled to file an Affidavit or Declaration of Violation requesting that the Court order the payment of compensatory damages to TracFone in the amount of Five Thousand Dollars and No Cents ($5,000,00 (U.S.)) for each Octopus Box purchased, sold, advertised, solicited and/or shipped in violation of the Permanent Injunction, or a single damages award of One Million Dollars and No Cents ($1,000,000.00 (U.S.)), whichever is greater. TracFone shall provide at least five (5) working days notice to Defendant(s) after filing an Affidavit or Declaration of Violation. The Court finds that any amounts awarded under this paragraph are compensatory and reasonable estimations of the minimum damages suffered by TracFone for such a breach and will serve to compensate TracFone for its losses in the event a Defendant violates the terms of this Permanent Injunction.

[D.E. 64 at pp. 13–14]. The Permanent Injunction also provides for the payment of attorneys' fees to the prevailing party of any proceeding brought for purposes of enforcing the Permanent Injunction. *Id.* at p. 14.

### B.  Factual Background

TracFone brought this lawsuit against Technopark in 2012 because Technopark was improperly selling devices capable of unlocking bulk quantities of TracFone telephones in violation of TracFone's rights (the "Prohibited Unlocking Device Selling Scheme"). On April 9, 2014, this Court ordered Technopark to cease that conduct. *Id.* at pp. 13–14. However, as set forth below, the Court finds that TracFone has established that Technopark has renewed this prohibited conduct and is once-again selling devices that are capable of unlocking TracFone phones. The Court finds that TracFone has established that Technopark's conduct violates the Permanent Injunction.

### 1.  The Court has Previously Enjoined Technopark From Selling Prohibited Unlocking Devices

As set forth above, this Court previously enjoined Technopark from selling devices capable of unlocking bulk quantities of TracFone cellphones on April 9, 2012. In the Permanent Injunction, the Court found that Technopark sold devices known as "Octopus Boxes." [D.E. 64 at p. 2]. The Octopus Boxes were used to hack TracFone phones in order to bypass restrictions put in place by TracFone's proprietary software, firmware, and default configuration files, which prevented the phone from being used on a wireless network other than TracFone's. *See* First Declaration of Shoaib Khan, TracFone's Senior Director of Mobile Device Security, at 7–8 (the "First Khan Declaration"). [D.E. 58–4].

In the Permanent Injunction, the Court found that TracFone established that Technopark encouraged and facilitated others to unlock TracFone phones that were designed and manufactured exclusively for use on TracFone's network. *Id.* The Court further found that that TracFone had established that, with the aid of the Octopus Box and Technopark's instructions, such phones could be unlocked for use on another carrier's wireless network. *Id.* at ¶ 5.

By marketing and selling devices to unlock, reflash, and ultimately enable TracFone Phones for service on a network other than TracFone's, the Court found that Technopark committed trademark infringement. [D.E. 64 at p. 5]. The Court further found that "Technopark's unlawful, unauthorized, and unlicensed sale of unlocking and/or reflashing boxes ... led to post-sale confusion by causing consumers who purchase TracFone [ ] Phones altered by Technopark's unlocking and/or reflashing boxes to believe that they are purchasing handsets with software licensed or approved by TracFone." *Id.* Because Technopark's conduct constituted trademark infringement, the Court en-

tered the Permanent Injunction prohibiting such conduct. [D.E. 64 at p. 5].

The Court found that entry of the Permanent Injunction was also supported by the fact that Technopark's conduct constituted copyright infringement. Specifically, the Court found that "Technopark's actions in reflashing or otherwise modifying the federally copyrighted TracFone Prepaid Software, without TracFone's authority or consent, creates an unauthorized reproduction and derivate work of the ... [s]oftware." *Id.* at p. 6. Moreover, because Technopark was "in possession of certain instrumentalities that avoid, bypass, remove, disable, deactivate, or otherwise impair the technological measures within the TracFone Prepaid Software that effectively control access to the proprietary TracFone Prepaid Software," the Court found that Technopark violated the Digital Millennium Copyright Act. *Id.* at pp. 7–8. For these and other reasons, the Court enjoined Technopark from engaging in conduct associated with, or in furtherance of, its scheme to market and sell devices capable of unlocking and reflashing TracFone handsets. *Id.*

2. **The Court finds that TracFone has established that Technopark has Renewed the Prohibited Unlocking Device Selling Scheme Under New Corporate Names: GSM Server and Sigmakey**

The Court finds that TracFone has established that a company based in Hong Kong called "Sigmakey" has been offering for sale a product that appears substantively identical to the Octopus Box that Technopark was selling in 2012. *See* D.E. 110–2, the Declaration of Kevin Wehling, TracFone's Fraud Investigations Manager, executed on February 25, 2016 (the "Wehling Declaration"), at ¶ 12. The Court finds that TracFone has established that it investigated the issue and purchased multiple Sigmakey products. *Wehling Declaration at 16.* The Court finds

that the product purchased is called the "Sigmakey Dongle." *Id.* at ¶ 13. The Court further finds that the Sigmakey Dongle's intended purpose is functionally identical to that of an Octopus Box, in that it allows end-users to unlock a TracFone phone, which is solely manufactured for use on TracFone's network, and enable that phone for use on another carrier's wireless network. *Id.* at 13, 20. As evidenced by the screen shot provided in TracFone's Motion, the Court finds that the landing page of Technopark's new website advertises the Sigmakey Dongles' key features.[1]

In its Motion, TracFone states that it purchased three Sigmakey Dongles from two different retailers: Cell Corner and GSM Server. *Id.* at ¶¶ 16–18. The Court finds that TracFone has established that both retailers sold the product for approximately two hundred dollars ($200.00). *Id.* at ¶¶ 17–18. The Court further finds that that TracFone has established that one of Technopark's retailers, Cell Comer, is located in West Palm Beach, Florida. The Court finds that the Sigmakey Dongles were shipped to various locations in America and ultimately received by TracFone. *Id.*

Moreover, the Court finds that TracFone has established that Technopark and GSM server are one in the same. Specifically, the Court finds that TracFone has established that users who navigate to the "Contacts" page of the GSM Server website are presented with contact information for the company, including GSM Server's corporate headquarters, which is listed as "Technopark Company Limited." Wehling Decl. at ¶ 29. Additionally, the Court finds that TracFone has established that the payment information presented to purchasers of the Sigmakey Dongle by GSM Server demonstrates its intimate connection to Technopark. Indeed, the Court finds that TracFone has established that TracFone's investigators were asked to wire the purchase funds for GSM Server's Sigmakey Dongle to *an account bearing the*

---

1. A website landing page is the initial webpage presented to a user upon accessing a website. Lanning Bryer et. al., *Shared Branding: Associated Use of Trademarks and Trade Dress Through Shared Retail Space* (Fnaal), 105 Trademark Rep. 772, 804 (2015) ("A site's home page is usually one of many landing pages."); *see also* MOBILE APPS FOR KIDS: CURRENT PRIVACY DISCLOSURES ARE DISAPPOINTING, Staff Report, Federal Trade Commission (February 2012), 2012 WL 529612, at *4.

name "TECHNOPARK COMPANY LTD." *See id.* at ¶¶ 30–31. In light of the apparent connection between GSM Server and Technopark, the Court finds that TracFone has established that the two entities are, in fact, the same.

The Court finds that TracFone's investigation has established that Technopark is also engaging in the prohibited conduct under the trade name, Sigmakey. Wehling Declaration at ¶¶ 12–16. As evidence of the connection between Technopark and Sigmakey, the Court finds that TracFone has established that a WHOIS lookup[2] through the Internet Corporation for Assigned Names and Numbers ("ICAAN") revealed that the sigmakey.com website is affiliated with three name servers[3] run by Technopark. *Id.* at ¶ 15.

██ This Court, like many in the Southern District of Florida, routinely considers WHOIS database information when the identity of a defendant is in question. *See Chanel, Inc. v. Bestbuyhandbag.com,* 2014 WL 7369640, at *1 (S.D.Fla. Dec. 29, 2014) ("The relevant WHOIS domain registration records identify the Registrant and contact information for the respective Subject Domain Names for Defendants 1–10.") (Rosenberg, J.); *Under Armour, Inc. v. 51nfljersey.com,* 2014 WL 644755, at *1 (S.D.Fla. Feb. 19, 2014) (Rosenbaum, J.) (considering WHOIS information when seeking to determine the identity of a defendant); *Chanel, Inc. v. 7perfecthandbags.com,* 2014 WL 352197, at *2 (S.D.Fla. Jan. 31, 2014) (Seitz, J.) (same); *Chanel, Inc. v. acheterchanel.com,* 2012 WL 3544844, at *1 (S.D.Fla. Aug. 16, 2012) (Rosenbaum, J.) (same); *Chanel, Inc. v. Krispin,* 2010 WL 4822737, at *2 (S.D.Fla. Oct. 18, 2010) (Torres, M.J.) *report and recommendation adopted,* 2010 WL 4825489 (S.D.Fla. Nov. 22, 2010) (Moreno, J.) (same).

Likewise, judges in other districts commonly consider WHOIS database information for this purpose. *See, e.g., Verizon California Inc. v. Onlinenic, Inc.,* 2009 WL 2706393, at *5 (N.D.Cal. Aug. 25, 2009); *Compana, LLC. v. Aetna, Inc.,* 2006 WL 829111, at *4 n. 3 (W.D.Wash. Mar. 27, 2006) (noting that "[u]nder the registration agreement with ICANN, registrars are required to maintain a WHOIS lookup service that allows an internet user to obtain certain identifying information about each domain name registrant."); *BKGTH Prods., LLC v. Does 1–20,* No. CIV.A. 13–5310, 2013 WL 5507297, at *6 (E.D.La. Sept. 30, 2013) (Noting that "[o]nce an IP address is captured, there are several methods that can be used to trace the user, one of which is ... to review domain registration information via the 'WHOIS' databases."); *but see, e.g., King Ranch, Inc. v. King Ranch Contractors, LLC,* 2013 WL 2371246, at *3 n. 3 (M.D.Fla. May 30, 2013).

Additionally, the Court finds that TracFone's investigation has established that Technopark has been selling Sigmakey Dongles through accounts on major international and internet retailers. Wehling Declaration at ¶ 14. Specifically, the Court finds that TracFone has established that Sigmakey Dongles were being sold through alibaba.com[4] by an account called "TECHNO-

---

2. A WHOIS lookup gives a user the ability to lookup a generic website domain such as www.sigmakey.com in order to discover the registered domain owner and other information. *See Gordon v. Virtumundo, Inc.,* 575 F.3d 1040, 1064 (9th Cir.2009) ("WHOIS is a publically available online database through which users can access information regarding domains, including the registrant's name, address, phone number, and e-mail address.").

3. A name server is an internet-connected computer that runs software, which attaches a URL (i.e. www.sigmakey.com) to an IP address, so that site visitors can more easily remember it. *Coal. for Icann Transparency Inc. v. Verisign, Inc.,* 464 F.Supp.2d 948, 952 (N.D.Cal.2006) ("A domain name is created when it is registered with the appropriate registry operator. A regis-

try operator maintains the definitive database, or registry, that associates the registered domain names with the proper IP numbers for the respective domain name servers. The domain name servers direct Internet queries to the related web resources.") (internal citations omitted).

4. Alibaba.com is "a Hong Kong corporation that operates a well-known network of websites, including www.alibaba.com—a business-to-business marketplace designed to connect buyers and sellers of a wide variety of products throughout the world—and www.aliexpress.com—a website connecting wholesale and other buyers to sellers in a wide variety of consumer products." *Spy Optic, Inc. v. Alibaba.Com, Inc.,* —— F.Supp.3d ——, ——, 2015 WL 7303763, at *1 (C.D.Cal. Sept. 28, 2015) (internal citations omitted).

PARK COMPANY LIMITED." *Id.* The Court similarly finds that the same product was being offered for sale on aliexpress.com by an account called "TECHNOPARK CO LTD." *Id.* The Court also finds that TracFone has established that it also discovered the Sigmakey Dongle listed for sale on amazon.com through a seller called "Sigma," whose amazon.com product page for the Sigmakey Dongle contains the following statement: "[s]hips from and sold by Technopark." *Id.*

TracFone's Motion states that after purchasing the Sigmakey Dongles, TracFone further confirmed that Technopark had renewed the Prohibited Unlocking Device Selling Scheme in violation of the Permanent Injunction. Upon reviewing TracFone's Motion and the supporting declarations, the Court finds that TracFone has established that, indeed, all three of the Sigmakey Dongle packages contained an invoice for the product, which was written on letterhead that read "Technopark Company, Ltd." *Id.* at 19. As evidenced by the screen shot in TracFone's Motion, The Court finds TracFone's contention to be consistent with the description of the letterhead set forth in the Wehling Declaration. Accordingly, the Court finds that TracFone has established that Sigmakey and Technopark are, in fact, one in the same.

**3. The Court finds that TracFone has established that Technopark's Conduct is Substantively Identical to the Prohibited Unlocking Device Selling Scheme, Which the Court Has Already Enjoined**

The Court finds that TracFone has established that Technopark's new unlocking device and scheme, the Sigmakey Dongle, damages TracFone in the same way as that of its predecessor device, the Octopus Box. The Court finds that the Sigmakey Dongle is used to unlock an Alcatel-manufactured mobile phone that is exclusive to TracFone. Wehling Declaration at ¶ 20; *See* D.E. 110-3, the Second Declaration of Shoaib Khan, TracFone's Senior Director of Mobile Device Security, executed February 17, 2016 (the "Second Khan Declaration"), at ¶ 4.

The Court finds that TracFone has established that, by using the Sigmakey Dongle, TracFone engineers were able to confirm that the Alcatel-manufactured mobile phone could be unlocked and enabled to work on another wireless network. Second Khan Declaration at 4, 11–12.

The Court further finds that TracFone has established that Technopark's Sigmakey Dongle affects the TracFone Alcatel model A851L Handset (the "TracFone Alcatel A851L Handset"). *Id.* at ¶ 4; Wehling Declaration at ¶ 21. The Court finds that TracFone has established that the TracFone Alcatel A851L Handset is manufactured exclusively for TracFone and is not available for use with any other wireless carrier. Wehling Declaration at ¶ 21. Moreover, the Court finds that the TracFone Alcatel A851L Handset's exclusivity is ensured by the TracFone-approved, secure configuration file that the device ships with, which prevents it from being activated and enabled for use on a wireless network other than TracFone's. *Id.* at ¶ 22.

The Court also finds that by using the Sigmakey Dongle and Technopark's instructions, TracFone engineers successfully unlocked the TracFone Alcatel A851L Handset and enabled it for use on a wireless network operated by a different wireless carrier. Second Khan Declaration at ¶¶ 4–12. Additionally, the Court finds that TracFone has established that the process was substantively identical to the previously-enjoined Prohibited Unlocking Device Selling Scheme. *Compare* Second Khan Declaration at ¶¶ 4–12 *with* First Khan Declaration, D.E. 58–4 at ¶¶ 4–5.

The Court finds that TracFone has established that, by following the Sigmakey Dongle instructions, TracFone's engineers managed to circumvent the TracFone-approved, secure configuration file that shipped with the TracFone Alcatel A851L Handset and that prevented the device from being used on another carrier's wireless network. Second Khan Declaration at 4–12. Further, the Court finds that TracFone has established that the Sigmakey Dongle then modified the secure, TracFone-approved configuration file to an insecure, unapproved state. *Id.* at ¶ 10.

The Court finds that TracFone has established that, after the operation completed and the TracFone Alcatel A851L Handset powered on, TracFone engineers verified that the Handset had been successfully unlocked and was enabled for use on the wireless network operated by Cricket Wireless—a different cell phone service company, whose wireless services are not authorized by TracFone. *Id.* at ¶ 11–12.

The Court also finds that TracFone has established that Technopark's continued conduct is substantively identical to the conduct enjoined by the Court in the Permanent Injunction. Specifically, the Court finds that Technopark's sale of an unlocking device and its efforts to facilitate and encourage others to use such a device to unlock TracFone phones has already been enjoined by this Court. [D.E. 64].

In light of the foregoing facts, the Court finds that TracFone has sufficiently established that Technopark has willfully violated the Permanent Injunction and should be held in contempt of Court. Accordingly, the Court finds that TracFone is entitled to reopen this case to redress Technopark's violation of the Permanent Injunction and to conduct discovery to determine the extent of the damage caused by Technopark's violation of the Permanent Injunction

### CONCLUSIONS OF LAW

#### A. Legal Standard

■ Technopark's violations of the Court's order entering the Permanent Injunction merits injunctive relief pursuant to the Court's civil contempt power and Federal Rule of Civil Procedure 70(e). The Eleventh Circuit has repeatedly held that "injunctions are enforced through the district court's civil contempt power." *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 829 (11th Cir.2010) (citing *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 n. 23 (11th Cir.2005)); *see also Belize Telecom Ltd. v. Gov't of Belize*, 2005 WL 7858276, at *4 (S.D.Fla. Apr. 13, 2005) ("Federal courts have the power to enforce an injunction, if necessary, through contempt proceedings.").

■ To establish civil contempt, this Court must determine that TracFone has shown, by clear and convincing evidence, that the underlying order was violated. *See McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir.2000); *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990). As the movant, TracFone must establish that: "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir.2002) (citing *McGregor*, 206 F.3d at 1383 (11th Cir.2000)). "The Supreme Court has made clear that the absence of willfulness is not a defense to a charge of civil contempt." *F.T.C. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir.2010) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949)).

Moreover, as the order that Technopark has disobeyed is in connection with a judgment, "Federal Rule of Civil Procedure 70(e) ... provides that when a party disobeys a lawful order, a district court may ... hold the disobedient party in contempt." *TracFone Wireless, Inc. v. Holden Prop. Servs., LLC*, 103 F.Supp.3d 1357, 1361 (S.D.Fla.2015); *Breen v. Tucker*, 821 F.Supp.2d 375, 383 (D.D.C.2011); *see also Rancheria v. Salazar*, 2013 WL 6185450, at *2 (E.D.Cal. Nov. 25, 2013) ("Rule 70(e) contempt may issue where the court has required the party to perform any specific act, and the party fails to comply within the time specified.")

■ "Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the grounds that he was unable to comply." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir.1992). However, a party can only demonstrate an inability to comply "by showing that they have made 'in good faith all reasonable efforts to comply.'" *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir.1991) (quoting *United States v. Ryan*, 402 U.S. 530, 534, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971)). This can be accomplished only by producing "detailed evidence specifically explaining why he cannot com-

ply." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 740 (11th Cir.2006).

The Court finds that TracFone has sufficiently established all the elements necessary to demonstrate that Technopark should be found in contempt of Court for its violation of the Permanent Injunction.

**B. The Court Finds the Order Permanently Enjoining Technopark's Conduct to be Clear, Unambiguous, Definite, and Specific As to Their Requirements, and that Technopark has Failed to Comply**

**1. Conduct that the Permanent Injunction Explicitly and Clearly Prohibits**

The Court finds that the Permanent Injunction issued against Technopark remains in effect. It states that this "Court retains jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of [the] Permanent Injunction." [D.E. 64 at p. 13]. The Court further finds the Permanent Injunction to be specific and definite. It permanently enjoins Technopark from engaging in the conduct described above, which, as TracFone has established, is substantially identical to the Prohibited Unlocking Device Selling Scheme. *Id.* at pp. 12–14.

The Court finds that TracFone has established that the Permanent Injunction is sufficiently clear and definite such that Technopark had notice of what conduct it was prohibited from engaging in: activities related to, and in furtherance of, the unlocking and reflashing of TracFone prepaid cell phones. *See Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1241 (11th Cir.2000) (finding the language to be sufficiently specific to support a contempt finding and stating that "[a] consent judgment need not recite every possible way in which a violation might occur.").

**2. Technopark Failed to Comply with the Court's Permanent Injunction**

The Court finds the Permanent Injunction to be valid and lawful. When passing on

motions for contempt based on trademark infringement, courts in this district and other district courts in the Eleventh Circuit have granted such motions when the defendants have, notwithstanding orders enjoining their conduct, continued to engage in the prohibited conduct and acted in disregard of the court's orders barring their actions. *Sizzler Family Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1535 (11th Cir. 1986) (affirming a finding of contempt and imposition of sanctions against a party for its violation of a court order restricting its use of a service mark); *see also Popular Bank of Florida v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 466 (S.D.Fla.1998) (finding a party in contempt of court for continuing to air commercials that were prohibited by the court's injunction); *Commodity Futures Trading Comm'n v. Commonwealth Fin. Grp., Inc.*, 874 F.Supp. 1345, 1358 (S.D.Fla. 1994) (finding a party in contempt of court for continuing to engage in fraudulent activities in violation of a preliminary injunction).

The Court observes that the facts of this case are similar to a case previously litigated by TracFone within the Eleventh Circuit. In *TracFone Wireless, Inc. v. GCA Elecs., LLC*, 950 F.Supp.2d 1326, 1329 (N.D.Ga.2013), Judge Timothy C. Batten of the Northern District of Georgia applied the applicable Eleventh Circuit test and found that TracFone established the elements of civil contempt when the defendants violated the permanent injunction against them, which was substantially similar to the Permanent Injunction here, by selling a product capable of unlocking and reflashing TracFone's Phones in violation of a court order prohibiting them from doing so. *GCA Elecs., LLC*, 950 F.Supp.2d 1326, 1329.

In *GCA*, after the final judgment and permanent injunction was entered, TracFone discovered that the defendants continued selling unlocking devices.[5] *See TracFone Wireless, Inc. v. GCA Elecs., LLC*, 2012 WL 4044864, at *1 (N.D.Ga. Sept. 13, 2012). Judge Batten reopened the case, found the defendants in civil contempt, and allowed

---

5. Incidentally, the Court finds that TracFone has established that, in 2012, the defendants in *GCA* were actually buying their unlocking devices from Technopark.

TracFone to conduct expedited discovery to determine the extent of the defendants' illicit conduct. *Id.*

Subsequently, after TracFone presented the fruits of its discovery efforts to the court, the court sanctioned the defendants for their willful violation of the final judgment and permanent injunction. *GCA Elecs., LLC*, 950 F.Supp.2d 1326, 1330. In light of the number of unlocking solutions sold by the defendants in violation of the court's order, TracFone was awarded damages in the amount of $7,804,870.38. *Id.* TracFone was also awarded its attorneys' fees and costs incurred due to enforcing the final judgment and permanent injunction. *Id.*

The Court finds that TracFone has sufficiently established that, here, just like the defendants in *GCA,* Technopark has failed to comply with the Permanent Injunction entered against it. Furthermore, the Court finds that TracFone has established that Technopark is selling devices that unlock TracFone phones, in direct violation of this Court's order.

The Court further finds that TracFone has established that Technopark is selling a product known as the Sigmakey Dongle, which does the same thing as the Octopus Box. The Sigmakey Dongle is substantially identical to the Octopus Box because it allows users to modify and circumvent restrictions put in place by the TracFone approved, secure configuration file that the device ships with, which prevents the TracFone Alcatel A851L Handset from being enabled for use on a wireless telecommunications network other than TracFone's. Wehling Declaration at ¶¶ 12, 21, 24.

**C. The Court Finds that Technopark is in Contempt and Awards TracFone Its Reasonable Attorneys' Fees and Costs**

The Court finds that TracFone has established that Technopark's continuing violations have caused TracFone substantial harm. The Court finds that the Permanent Injunction provided a liquated penalty for each prohibited device sold by Technopark. [D.E. 64 at p. 13]. Specifically, the Court finds that TracFone is entitled to a sum of $5,000.00 for each unlocking device "purchased, sold, advertised, solicited and/or shipped in violation of the Permanent Injunction, or a single damages award of One Million Dollars and No Cents ($1,000,000.00 (U.S.)), whichever is greater." *Id.* at pp. 13–14.

The Court further finds that the amount of damage suffered by TracFone is likely to be significant due to the magnitude of Technopark's continued, prohibited conduct. As an initial matter, The Court finds that TracFone has established that Technopark offers the Sigmakey Dongle for sale directly through its website, as well as accounts on major international, domestic, and internet retailers. *See* Wehling Declaration at 13, 14. Moreover, Technopark offers the Sigmakey Dongle for wholesale to certain resellers such as Cell Corner and GSM Server, as described in detail above. *Id.* at 16. Additionally, the Court finds that TracFone has established that Technopark further advertises the fact that it is seeking additional resellers through which to distribute the Sigmakey Dongle, and encourages businesses to apply to become such a reseller. *Id.* at ¶ 25.

Additionally, the Court finds that TracFone has sufficiently established that Technopark has engaged in substantial efforts to market, advertise, and solicit the sale of the prohibited devices, stating that it has received over 2,500,000 views and 5,000 unique subscribers to its YouTube channel. *Id.* at 25–27.

Moreover, the Court finds that TracFone has established Technopark's violation of the Permanent Injunction through other screen shots of Technopark's website. For example, the Court finds that one such post from Technopark's website, in which Technopark is lauds its marketing successes and conduct, violates the Permanent Injunction.

The Court finds that TracFone has sufficiently established that, at a minimum, it is entitled to a liquidated damages award of $1,000,000.00. However, because TracFone is entitled to a liquidated penalty of $5,000.00 per prohibited device sold, its actual damages may be far greater. Indeed, The Court finds that Technopark need only have sold 200

prohibited devices in violation of the Permanent Injunction in order to eclipse the *minimum* $1,000,000.00 penalty. In light of the scope of Technopark's renewed Prohibited Unlocking Device Selling Scheme, the Court finds that the actual damages suffered by TracFone are likely to be far greater than the minimum liquated sum, further necessitating the need for expedited relief.

In addition to its liquidated damages, the Court finds that TracFone has established that it has incurred legal fees in pursuing Technopark and hiring an undercover investigator to determine that Technopark had begun its prohibited activities anew. Courts routinely grant attorneys' fees and costs incurred in bringing a motion for contempt. *See, e.g., GCA Elecs., LLC,* 950 F.Supp.2d at 1329–30. Further, the Permanent Injunction provides that the prevailing party in any proceeding brought to enforce the terms of the Permanent Injunction is entitled to recover its attorneys' fees and costs. [D.E. 64 at p. 14].

Accordingly, the Court finds that TracFone is entitled to recover the reasonable attorneys' fees and costs it incurred in bringing this Motion.

### RELIEF

Accordingly, for the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED** that TracFone's Motion to Reopen Case to Enforce Violation of Permanent Injunction is **GRANTED.** The Court hereby **ORDERS** that:

1. This Court has jurisdiction over all the parties and all of the claims set forth in TracFone's complaint.

2. The Court finds that TracFone has sufficiently established that Technopark has been violating the terms of the Permanent Injunction by engaging in the same conduct prohibited by the Court.

3. The Court hereby reopens this case with respect to Technopark based on Technopark's violations of the Permanent Injunction this Court entered against it in on April 9, 2012.

4. The Court finds Technopark in contempt of Court based on its violations of the Partial Final Judgment and Permanent Injunction.

5. The Court grants TracFone ninety (90) days to conduct discovery in order to ascertain the amount of damages to be awarded to TracFone as a result of Technopark's violations.

6. Within 90 days from the date of this Order, TracFone, if it so elects, may file a motion and supporting affidavit setting forth the fruits of its discovery efforts, if any, and providing a calculation for the exact amount of damages suffered due to Technopark's misconduct. If TracFone elects not to file such a motion, the Court shall enter a money judgment against Technopark in the amount of $1,000,000.00, consistent with the terms of the Permanent Injunction.

7. Within 90 days from the date of this Order, TracFone, if it so elects, may file a motion and supporting affidavit seeking an award of its reasonable costs and attorneys' fees incurred due to bringing the Motion.

8. The Court retains jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of this Order by a finding of contempt. If, at any time, the Court finds Defendants in contempt for violation of this Court's Order, TracFone may, at its discretion, seek the appropriate damages.

9. TracFone shall serve a copy of this Order on Technopark and submit proof thereof to this Court.

**DONE AND ORDERED** in Chambers at Miami, Florida this 17th day of March, 2016.